**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

ALFRED HENRY                                                                                        PLAINTIFF

v.                                                     NO. 4:11CV00449 JLH

JIM ROBERSON, in his capacity as Sheriff
of LONOKE COUNTY, ARKANSAS;
JACK FITZHUGH; TONY WILSON;
and STEVE FINCH                                                                                DEFENDANTS

**OPINION AND ORDER**

Alfred Henry brings this action against Lonoke County Sheriff Jim Roberson, in his official capacity, as well as Deputy Sheriffs Jack Fitzhugh, Tony Wilson, and Steve Finch, pursuant to 42 U.S.C. § 1983. Henry alleges that the defendants violated his Fourth Amendment right to be free from unreasonable searches and seizures. The defendants have moved for summary judgment, and Henry has responded. For the following reasons, the motion for summary judgment is granted in part and denied in part.

**I.**

This action arises out of an incident between Henry and two Lonoke County Sheriff's Department deputies, Wilson and Fitzhugh, that occurred at Henry's residence on March 31, 2011. An "incident report" indicates that prior to the incident, Brenda Henry, Alfred Henry's ex-wife, filed a complaint with the Department. Document #20-1. According to Tanya Cross's narrative in the report, Brenda was upset and reported that she had recently gone through a divorce but was unable to retrieve the furniture belonging to her from her ex-husband's house. Cross states that Brenda provided a copy of divorce paperwork indicating that she and Henry had agreed that she would receive most of the furniture. According to the report, Cross advised Brenda that the Department did not referee civil matters but usually kept a deputy in the area in such cases. *Id.*

Alfred Henry confirmed at his deposition that he and Brenda had entered into a property settlement agreement that awarded her all of the household furnishings. Document #20-1, p. 9. He testified that Brenda had taken everything to which she was entitled out of the residence a few weeks before March 31. *Id.* at 9-10. He denied that he had ever interfered with her attempts to remove the furnishings. *Id.* at 18-19. Notwithstanding Brenda's protestations to the contrary, Henry testified that a state court found that he had complied with his duties under the settlement with respect to the household furnishings. *Id.* at 12-13.

Alfred Henry testified that he was asleep when Wilson woke him up by announcing his presence on the intercom. *Id.* at 31. He testified that Wilson said he was from "[t]he Sheriff's department," that Henry "need[ed] to come to the front door," and that Henry was in contempt of court. *Id.* at 31-32. Henry admits that out of paranoia he initially pretended to be his brother, but recanted when Wilson said, "[i]f this is Alfred, you better come to the door." *Id.* He testified that he asked for and received permission to dress. *Id.* at 32-33. Henry then called his brother, who lived nearby, and asked him to come over. *Id.* at 6, 33.[1]

Henry testified that when he opened the front door Wilson told him that he was in contempt of court. He testified that he remembered at that point that his house alarm was set, so he told Wilson to hold on while he rushed into the kitchen to turn off the alarm.[2] Henry testified that when he turned around Wilson was standing in the kitchen holding some papers. Henry testified that he

---

[1] By and large, Wilson's narrative in the incident report fits with Henry's testimony about their initial conversation. Wilson states that he made contact with Henry via intercom and asking him to come to the front door after explaining to him who he was and why he was at the house. According to Wilson, Henry first pretended to be his brother alleging that Henry was not home, but then admitted to his identity and agreed to come to the door. Document #20-1.

[2] Wilson claims that Henry told him to come in while he shut off the house alarm. Document #20-1.

asked Wilson, "I'm in contempt for what?" And Wilson replied, "You won't give your wife her furniture." *Id.* He testified that he said to the deputy, "Look around. Do you see any furniture?" *Id.* at 34.

Henry testified that about that time his brother arrived. Brenda was outside with a moving truck, her brother, and his son. *Id.* Henry testified that he asked Wilson what Brenda was doing outside, and the deputy replied that she was there to get her furniture. *Id.* at 35. Henry testified that he told Wilson that nothing in the house belonged to Brenda and then told the deputy, "You need to get out of my house. You need to take her and y'all need to leave." Henry admitted that he became angry and that his brother tried to calm him. Henry testified that he told Wilson, "you're not taking nothing out of this house and she is not coming in this house." *Id.*

According to Henry, Wilson called Fitzhugh who came to the residence about ten minutes later. *Id.* at 35-36. Henry testified that he had a similar exchange with Fitzhugh, who then told Wilson to take photographs. Henry testified that he was angry and adamantly refused to allow them to take photographs, but that his brother told him to let them take pictures. *Id.* He testified that he argued with his brother and indicated to the officers that, despite his brother's comment, he did not want photographs taken. *Id.* at 40. Henry testified that Wilson took pictures of all of the rooms in the house. *Id.* at 36-37. He testified that the officers then went outside and that his neighbors were standing around watching. Subsequently, the officers as well as Brenda and her relatives left.[3] *Id.*

Henry testified that his divorce attorney later determined that the officers had made a recording of the incident but were not acting pursuant to a warrant. *Id.* at 38. He testified that his

---

[3] Wilson states in the incident report that he explained the details of Brenda's complaint to Henry, and that Fitzhugh subsequently arrived and advised both parties that the matter was civil and that they should consult with their attorneys. Wilson admits that he took photographs of the contents of every room in the house. Document #20-1.

divorce attorney had talked with Finch, a captain, who indicated that he had told the officers to be in the area, but not to enter the residence. *Id.* However, Henry testified that Wilson told him that Finch had directed Fitzhugh to come to Henry's house and help Brenda get her furniture. *Id.* at 15, 21-23, 26-27, 30, 38, 51-55.[4] According to Henry, Fitzhugh said that he had received orders the day before to come to the residence on March 31. *Id.* at 22-23.

Henry emphasized that he told both the officers to leave several times. *Id.* at 43. He admits that no physical damage was done to his residence or any of its contents. *Id.* at 57. He also testified that, as far as he knew, Roberson had no direct involvement with the incident. *Id.* at 60-61. Finally, Henry testified that he was not aware of any other instances of the Department becoming involved under similar circumstances. *Id.* at 55. However, in his responses to Henry's interrogatories, Finch stated that, during his career at the Department, he previously was involved in similar incidents. Document #25.

It is undisputed that the officers were not acting pursuant to a warrant on March 31, 2011. On May 31, 2011, Henry commenced this action.

## II.

A court should enter summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). The moving party bears the initial responsibility of

---

[4] According to Wilson's narrative in the incident report, Fitzhugh asked him to meet Brenda at Pleasant Hill Baptist Church. Brenda stated that she was trying to get furniture belonging to her from the home she used to share with her ex-husband. Wilson reports that Fitzhugh asked him to make contact with Henry and, if he succeeded, to let Brenda get the furniture. Wilson states that he left Brenda at the church while he went to Henry's home. Document #20-1.

demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party meets this burden, the nonmoving party must respond by coming forward with specific facts establishing a genuine dispute for trial. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *PHL Variable Ins. Co. v. Fulbright McNeill, Inc.*, 519 F.3d 825, 828 (8th Cir. 2008). A genuine dispute exists only if the evidence is sufficient to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. When a nonmoving party cannot make an adequate showing sufficient to establish a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23, 106 S. Ct. at 2552.

### III.

The defendants contend that Henry only sued them in their official capacities and, consequently, that Lonoke County is the only actual defendant with respect to this action. *See Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (a suit against a sheriff in his official capacity "must be treated as a suit against the County.") (citing *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991)). Thus, the defendants argue that they are entitled to summary judgment because: (1) Henry cannot offer evidence of the existence of any unconstitutional policy or custom; (2) Henry cannot offer evidence of any underlying constitutional violation; (3) Henry cannot offer evidence that any county policy or custom was the "moving force" behind any underlying constitutional violation; (4) because Lonoke County cannot be held vicariously liable under section 1983, and (5) because Henry cannot establish any damages.

**A.     Individual Capacity Claims**

As an initial matter, the defendants argue that this action is only brought against the Lonoke County because Henry did not "expressly and unambiguously" state in his pleadings that he was suing any of the officials in their individual capacities. *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999).[5] In order to guarantee "that the defendant receives prompt notice of his or her potential personal liability," the Eighth Circuit has "repeatedly stated that section 1983 litigants wishing to sue government agents in both capacities should simply use the following language: 'Plaintiff sues each and all defendants in both their individual and official capacities.' " *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989) (quoting *Rollins by Agosta v. Farmer*, 731 F.2d 533, 536 n.3 (8th Cir. 1984)). Nevertheless, the Eighth Circuit has perused entire complaints to determine if there is language expressing an intent to sue officials individually. *See*, *e.g.*, *Baker v. Chisom*, 501 F.3d 920, 924 (8th Cir. 2007) (reviewing caption and body of complaint, but finding, at most, "cryptic hints"); *Nix*, 879 F.2d at 431 (discussing various paragraphs of the complaint and finding no evidence that the suit was brought against the defendant individually); *Rollins by Agosta v. Farmer*, 731 F.2d 533, 535 (8th Cir. 1984) (finding reference to "good faith" of defendant sufficiently alleged individual liability because "good faith" protects officials from personal liability).

Here, paragraph 29 of Henry's complaint alleges that "at all times complained of herein[,]" Fitzhugh, Wilson, and Finch, "individually and in concert with each other, acted . . . to deprive [Henry] of his rights" under the Fourth and Fourteenth Amendments as well as sections 1983 and

---

[5] Other circuits have questioned the bright-line rule laid down by the Eighth Circuit. *See*, *e.g.*, *Moore v. City of Harriman*, 272 F.3d 769, 773 (6th Cir. 2001) (collecting cases).

1988.[6] Following the Eighth Circuit's example, the Court concludes that although Henry's complaint does not specifically predicate the phrase "sued in his individual capacity" of Fitzhugh, Wilson, or Finch, the complaint specifically alleges that these three defendants "individually" violated Henry's constitutional rights. *See Bird v. Jefferson Cnty. Sheriff's Dept.*, 363 Fed. App'x 425, 426 (8th Cir. 2010) ("Because the complaint expressly stated that [the plaintiff] was suing [the defendants] "Individually" and because [the plaintiff]'s opposition to [the defendants'] summary judgment motion left no doubt that [the plaintiff] intended to sue [the defendants] in their individual capacities, it was error for the court to conclude that [the plaintiff] sued [the defendants] in their official capacities only."). Henry's allegation is more than a "cryptic hint," *see Baker*, 501 F.3d at 924, and was sufficient to put Fitzhugh, Wilson, and Finch on notice of their potential personal liability.

**B.     Underlying Constitutional Violation**

"A bulwark for individual liberties, 42 U.S.C. § 1983 provides legal redress to individuals who suffer violations of their federal rights at the hands of any 'person' who acts 'under color' of state law." *Montano v. Hedgepeth*, 120 F.3d 844, 848 (8th Cir. 1997). "[A] § 1983 plaintiff can prevail only if he proves he has been subjected to a deprivation of 'rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Id.* (quoting *Comiskey v. JFTJ Corp.*,

---

[6] Henry's complaint also states that Roberson is sued in his capacity as Sheriff of Lonoke County but does not so limit the claims against the other officers. Nonetheless, this only *implies* that the other defendants were sued in their individual capacities; it does not amount to a "clear statement" or "specific pleading." *Baker*, 501 F.3d at 924 (plaintiff failed to plead individual liability against defendants where the complaint was silent as to the capacities in which they were named, even though ten other county defendants were specifically sued "in their Official Capacities and in their Individual Capacities."); *cf. Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 619-20 (8th Cir. 1995) (rejecting argument that plaintiff provided the defendants with ample notice that she was suing them in their personal capacities when the caption and body of the complaint referred to them by name rather than by their official capacity).

989 F.2d 1007, 1010 (8th Cir. 1993)).  Analogizing to *Arizona v. Hicks*, 480 U.S. 321, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987) (merely recording serial numbers is not an unconstitutional seizure), the defendants contend that taking photographs, without more, is not a seizure. *A fortiori*, according to the defendants, the officers' conduct in the instant case could not have been an *unreasonable* seizure.

Even if the defendants' analogy is accurate, the Fourth Amendment does not merely protect against unreasonable seizures, but also against unreasonable *searches*.  *United States v. Wells*, 648 F.3d 671, 674-75 (8th Cir. 2011) (" 'The right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated . . . .' " ) (citing U.S. Const. amend IV).  "According to the Supreme Court, a Fourth Amendment search 'occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.' " *United States v. Va Lerie*, 424 F.3d 694, 701 (8th Cir. 2005) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984)).  The Fourth Amendment specifically recognizes that a person has a reasonable expectation of privacy in his own house. *See also United States v. Salter*, 358 F.3d 1080, 1084 n.2 (8th Cir. 2004) ("We find [the defendant] had an expectation of privacy in the area searched, because it was his home.").  Additionally, warrantless searches are generally presumptively unreasonable.  *United States v. Castaneda*, 438 F.3d 891, 893 (8th Cir. 2006) (quoting *Horton v. California*, 496 U.S. 128, 133, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990)).

It is undisputed that Wilson and Fitzhugh came to Henry's house in uniform as Lonoke County Sheriff's Department deputies.  Viewed in Henry's favor, the evidence establishes that Henry insisted a number of times that Wilson, and later Fitzhugh, leave his residence.  The officers failed to do so, and instead went through the entire house taking photographs.  Physically inspecting

and photographing each room in a house is a quintessential "search" within the meaning of the Fourth Amendment. *Cf. United States v. Walsh*, 299 F.3d 729, 733 (8th Cir. 2002) (describing even a "quick look" into a person's bedroom in accordance with a protective sweep as a "search"). Because it is undisputed that the officers did not have a warrant, the search of Henry's home was presumptively unreasonable. Consequently, the defendants must produce " 'evidence of consent or of some other recognized exception to the warrant requirement.' " *Der v. Connolly*, 666 F.3d 1120, 1128 (8th Cir. 2012) (quoting *Valance v. Wisel*, 110 F.3d 1269, 1278 (7th Cir. 1997)). Henry testified that he never consented to the search. Further, the defendants have offered no evidence that some other exception to the warrant requirement justified the search. Therefore, the Court cannot find as a matter of law that Henry did not suffer a violation of his constitutional rights.

## C.    Captain Finch's Individual Liability

Although Henry has established a question for the jury regarding whether Wilson and Fitzhugh's actions violated his constitutional rights, Henry has failed to come forward with evidence tending to show that Finch's conduct violated his constitutional rights. " 'Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009)). "[A] supervising officer can be liable for an inferior officer's constitutional violation only if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation." *Id.* (quotations omitted).

Here, the evidence is in dispute about whether Finch merely told Fitzhugh to be in the area or whether he directed him to assist Brenda in securing her belongings from Henry's residence.

Assuming that Finch directed Fitzhugh to assist Brenda in removing her belongings, this instruction does not amount to an order encouraging Fitzhugh to violate Henry's constitutional rights. Fitzhugh and Wilson could have complied with such an order without violating Henry's rights. For example, the officers could have secured Henry's permission to enter the house and assist Brenda in removing any property still belonging to her. Henry points to no evidence, such as prior incidents of misconduct, suggesting that Finch had a reason to think that Fitzhugh might act unconstitutionally in carrying out his order. To hold that a superior officer "participated" in a constitutional deprivation merely because his inferiors unexpectedly engaged in unconstitutional shenanigans while carrying out an order which could have been carried out in an entirely constitutional manner, would be to import vicarious liability into section 1983. In the absence of a reason for Finch to think that Fitzhugh was predisposed to act unconstitutionally, Finch was entitled to presume that the deputies would comply with the law in carrying out orders.

Furthermore, because Henry points to no evidence that Finch should have anticipated that Fitzhugh might carry out his order in an unconstitutional manner, at the very least Finch is entitled to qualified immunity under a "direct participation" theory. *Cf. Parrish*, 594 F.3d at 1002. For the same reason, Finch had no occasion to know that he needed to more closely supervise Fitzhugh. Therefore, even if Henry could assert a "failure to supervise" claim against Finch, Finch would similarly be entitled to qualified immunity under this theory. *See Parrish*, 594 F.3d at 1002. Finally, Henry has offered no evidence that Finch was responsible for Wilson or Fitzhugh's training. Summary Judgment is appropriate on Henry's claims against Finch in his individual capacity.

**D.     Official Capacity Claims**

Henry's claim against Roberson—as well as against the other defendants in their official capacities—are claims against Lonoke County. *See Liebe*, 157 F.3d at 578. Although there is a question of material fact regarding whether Henry's constitutional rights were violated by Wilson and Fitzhugh, the County is still entitled to summary judgment unless Henry can offer evidence that the "constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2007) (citing *Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 690-92, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)).

Henry offers no evidence of any official county or law enforcement policy directing or encouraging officers to engage in conduct which violates a person's Fourth Amendment rights. *See Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) ("[T]his Court does not use the terms 'policy' and 'custom' interchangeably when conducting a *Monell* analysis. Rather, a 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters."). Merely identifying prior constitutional violations is insufficient to establish the existence of some unconstitutional official policy. Otherwise, the rule against municipal vicarious liability under section 1983 would be rendered nugatory. *Cf. Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 390-91 (8th Cir. 2007). The only evidence regarding official policy in this case is the report wherein Tanya Cross indicated that the Sheriff's Department "will not referee civil matters."

Even where there is no official policy behind a constitutional violation, Henry's claim against Lonoke County may survive summary judgment if he can point to evidence of an unconstitutional custom giving rise to his violation. *See Russell v. Hennepin Cnty.*, 420 F.3d 841,

11

849 (8th Cir. 2005) (A municipal custom is a practice of municipal officials that is not authorized by written law, but which is so permanent and well-settled as to have the force of law).  Henry must offer evidence tending to establish:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> (3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, *i.e.*, [proof] that the custom was the moving force behind the constitutional violation.

*Mettler*, 165 F.3d at 1204 (quoting *Ware v. Jackson Cnty.*, 150 F.3d 873, 880 (8th Cir. 1998)).

"A single incident normally does not suffice to prove the existence of a municipal custom." *Id.* at 1205 (citing *Okla. City v. Tuttle*, 471 U.S. 808, 823-24, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985)).  However, Henry points to Finch's response, to one of the plaintiff's interrogatories, wherein Finch states: "Although there have been some similar incidents in Defendant Finch's nearly 30 years with the Sheriff's Department, he can not recall each of the previous similar occurrences."  This vague statement about "some similar incidents" spread over thirty years is insufficient, without more, to establish that the Lonoke County Sheriff's Department has the kind of pervasive and well-settled practice of violating individuals' Fourth Amendment rights such that the practice amounts to an official custom that has the force of law.  *See*, *e.g.*, *Thelma D. By & Through Delores A. v. Board of Educ. of City of St. Louis*, 934 F.2d 929, 933 (8th Cir. 1991) (Five prior incidents of unconstitutional misconduct by official over a sixteen-year period not sufficient to establish widespread, persistent pattern of unconstitutional misconduct).

Even if a jury could find that the Lonoke County Sheriff's Department has a widespread unconstitutional practice based on Finch's statement, Henry offers no evidence tending to establish that any official with "final policymaking authority" was deliberately indifferent to or tacitly authorized such a custom. *See Williams v. Butler*, 863 F.2d 1398, 1401 (8th Cir. 1988) ("[O]nly officials possessing final policymaking authority can subject a municipality to § 1983 liability.") (citing *Monell*, 475 U.S. at 483, 106 S. Ct. at 1300). There is good reason to think that the sheriff is a final policymaking authority with respect to an Arkansas county's sheriff's department. *See, e.g.*, *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 795 n.10, 117 S. Ct. 1734, 1742 n.10, 138 L. Ed. 2d 1 (1997) (citing *Crowder v. Sinyard*, 884 F.2d 804, 828 (5th Cir. 1989), *abrogated on other grounds by Horton*, 496 U.S. at 153, 110 S. Ct. at 2316, for the proposition that the "Arkansas sheriff sets county policy in area of law enforcement"); *see also Hayes v. Faulkner Cnty., Ark.*, 285 F. Supp. 2d 1132, 1139 (E.D. Ark. 2003) ("It is undisputed that Sheriff Montgomery is one of the County's official policymakers."). Regardless, Henry testified that he had no reason to think that Sheriff Roberson knew about his situation before the incident occurred, nor has he offered evidence that Roberson was familiar with the incidents to which Finch's statement refers. *See P.H. v. Sch. Dist. of Kan. City*, 265 F.3d 653, 659 (8th Cir. 2001) ("[An official] may not be found to have been deliberately indifferent to or to have tacitly authorized conduct of which [he] was unaware."). Nor has Henry, who has the burden of proof, offered any evidence that Finch, as a captain, had final policymaking authority. In fact, *Crowder* and *Hayes* indicate that a subordinate officer to a sheriff in Arkansas does not have final policymaking authority for the purposes of establishing section 1983 liability.

For these reasons, summary judgement is appropriate on Henry's official capacity claims.[7]

**E.     Damages**

Finally, the defendants contend that Henry's claims for compensatory and punitive damages should be dismissed because Henry has offered no evidence that he suffered any compensable injury and because Lonoke County is immune from punitive damages. Because the Court grants summary judgment on Henry's official capacity claims, the defendant's contention regarding punitive damages is moot. Compensatory damages which can be awarded in a section 1983 case include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation, personal humiliation, mental anguish and suffering, and physical pain. *See Jackson v. Crews*, 873 F.2d 1105, 1109 (8th Cir. 1989) (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 106 S. Ct. 2537, 91 L. Ed. 2d 249 (1986)). Here, Henry has alleged that he suffered from *inter alia* emotional distress, embarrassment, and humiliation. He testified that his neighbors could observe multiple police cars and his ex-wife in front of his house, and that some of his neighbors were outside watching during the incident. The Court cannot say as a matter of law that Henry is not entitled to any compensatory damages.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Document #18. Alfred Henry's claims against Jim Roberson in his capacity as Sheriff of Lonoke County, and against the remaining defendants in their official

---

[7] To the extent Henry is attempting to hold the County liable vicariously liable for the conduct of the individual officers, as the defendants aver, Henry's attempt fails because a local government may not be sued under section 1983 on a respondent superior theory of liability. *See Parrish*, 594 F.3d at 997 (quoting *Monell*, 436 U.S. at 694, 98 S. Ct. at 2037). Because summary judgment is granted, the Court need not address the defendants' other arguments regarding Lonoke County's liability.

capacities, are dismissed with prejudice. Henry's individual capacity claims against Steve Finch are also dismissed with prejudice. Because no claims remain against Roberson or Finch, they are dismissed from this action. Henry's individual capacity claims against Jack Fitzhugh and Tony Wilson remain.

    IT IS SO ORDERED this 2nd day of March, 2012.

                                                            _____
                                                            J. LEON HOLMES
                                                            UNITED STATES DISTRICT JUDGE